**In re SIERRA–CAL, a Nevada Corporation, dba Sierra–Cal Lodge, Debtor.**

**Bankruptcy No. 96–25693–C–11.**

United States Bankruptcy Court, E.D. California.

June 27, 1997.

Stephen A. Koonce, Jarvis, Longaker, Koonce & Dashiell, Sacramento, CA, for debtor.

William B. Cherry, William B. Cherry and Associates, Stateline, NV, for objecting creditors.

## OPINION

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

The issue, which appears to be a question of first impression, is whether in plan confirmation proceedings the mandatory disallowance of certain claims pursuant to 11 U.S.C. § 502(d) should be imposed when calculating the hypothetical chapter 7 liquidation required by the "best interests" test.

This court concludes that § 502(d), which mandatorily disallows claims of creditors who received avoidable transfers or who owe the estate, does apply in the "best interests" test analysis under 11 U.S.C. § 1129(a)(7)(A)(ii). A plan of reorganization fails the "best interests" test when it purports to give any value to a creditor who has a claim disallowable under § 502(d) at the expense of creditors and interest holders who are not under a § 502(d) disability and who would receive a distribution in a hypothetical chapter 7 liquidation in which § 502(d) is enforced.

This court further concludes that a plan proponent has an affirmative duty under 11 U.S.C. § 1125 to disclose all known § 502(d) disabilities, even if that means that the plan proponent must confess or inform against affiliates, insiders, and friends.

The confirmation of such a plan, assuming adequate disclosure, could occur only if either: (1) the § 502(d) disability is removed by reversing all avoidable transfers and disgorging all funds owed to the trustee; or (2) all affected creditors and interest holders actually accept the plan.

### FACTS

Sierra-Cal is a debtor in possession that operated a hotel ("lodge") in South Lake Tahoe, California, until it was sold for

$2,750,000 in a combination of cash and secured notes.

The estate now consists of about $440,000 on deposit in the registry of the court plus the stream of income on $325,000 in secured notes that are payable over ten years.[1]

The first deed of trust, all outstanding taxes, and expenses of sale were previously extinguished by payment through escrow. The plan of reorganization provides for liquidating the remaining debt.

The remaining secured debt is owed to insiders, all of whom have relationships that center about Carl R. Corzan, who is the debtor corporation's president. Corzan, directly and through affiliates and relatives, owns or controls about 91.2 percent of the debtor corporation's shares.[2]

CRC Trust,[3] an affiliate that owns 25.5 percent of the debtor corporation, holds a deed of trust securing a debt of about $293,000. The plan proposes to pay CRC Trust in full from the sale proceeds on deposit in the registry of the court.

SCF, Inc. ("SCF"), another Corzan entity that owns 18.5 percent of the debtor,[4] has two secured claims. One is a junior deed of trust securing a debt of about $223,000 that would be paid $90,000 on the effective date of the plan, with the balance paid over ten years. The other is a personal property security interest on furnishings and equipment securing a debt listed as $66,000, the outstanding balance of which would be paid on the effective date of the plan.

SCF's personal property security interest is not supported by a financing statement that has been recorded in accordance with Article 9 of the Uniform Commercial Code and, hence, is avoidable under the bankruptcy trustee's "strongarm" power. This debt has also been reduced by more than $28,000 during the course of this chapter 11 case, at least $10,000 of which was paid by the debtor without court authorization and, accordingly, is also avoidable by a bankruptcy trustee as an unauthorized postpetition transfer.

The plan was modified to treat the personal property claim as unsecured after the pertinent facts were disclosed for the first time during Corzan's testimony at the confirmation hearing. The debtor conceded that the security interest could not withstand a trustee's "strongarm" avoiding power and that there had been avoidable postpetition transfers.

Unsecured claims that are not disputed are approximately $7,500. The objecting creditor, a lessee of the debtor whose lease was rejected early in the case, has a disputed unsecured claim in excess of $175,000. The unsecured claims will be paid from a percentage of net revenues in annual payments over a period of seven years with interest at 8 percent.

The various Corzan entities will retain their ownership interests.

### DISCUSSION

#### I.

The initial focus is on § 1129(a)(7), which is an essential element for confirmation of a plan of reorganization that cannot be finessed by a "cram down" under § 1129(b).[5]

The primary method of satisfying § 1129(a)(7) is the "best interests" test prescribed by § 1129(a)(7)(A)(ii) that contrasts the plan distributions with distributions in a hypothetical chapter 7 liquidation. The key issue presented here is the application of the

---

1. Round sums are used throughout this opinion for purposes of clarity. The precise dollar amounts are not materially different.

2. The capital stock of the debtor corporation is as follows: Mr. Corzan also holds a 35.8 percent interest; CRC Trust (which is indirectly controlled by Mr. Corzan, the trustor) holds a 25.5 percent interest; SCF, Inc. (a majority of which is owned by Corzan family members and the CRC Trust) holds an 18.5 percent interest; and June Manifold Corzan (Mrs. Corzan), holds an 11.4 percent interest in the debtor.

3. CRC Trust is an irrevocable trust created by Mr. Corzan as trustor, the co-trustees of which are his spouse and his brother-in-law, and the beneficiaries of which are his adult children.

4. SCF is a corporation in which Corzan family members and CRC Trust own the majority of shares and of which Mr. Corzan is president.

5. The issue of "cram down" under § 1129(b) cannot be considered unless the requirements of §§ 1129(a)(1)-(7) & (9)-(13) have first been met.

§ 502(d) disability in the context of the "best interests" test.

The alternative method of satisfying § 1129(a)(7) with respect to an impaired class is actual acceptance by each creditor who would do better in a chapter 7 liquidation than under a chapter 11 plan.[6]

### A

The "best interests" test permits a plan to be confirmed without actual acceptance by each holder of a claim or interest that would be impaired by the plan if each holder "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A)(ii).

The "best interests" concept is a cornerstone of the theoretical underpinnings of chapter 11. It stands as an "individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation." 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7] (Lawrence P. King et al. eds., 15th. ed. rev. 1997) ("COLLIER"); *In re Best Prods. Co.*, 168 B.R. 35, 71–72 (Bankr.S.D.N.Y.1994).

■ The "best interests" test must be satisfied even with respect to claims that are not eligible to vote because they are contingent or disputed. *Bell Rd. Inv. Co. v. M. Long Arabians (In re M. Long Arabians)*, 103 B.R. 211, 216 (9th Cir.BAP 1989).

If a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization, then a reorganization is inappropriate and a chapter 11 plan should not be confirmed.

■ Applying the "best interests" test requires the court to conjure up a hypothetical chapter 7 liquidation that would be conducted on the effective date of the plan.

■ The hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7. It contemplates valuation according to the depressed prices that one typically receives in distress sales. 7 COLLIER ¶ 1129.03[7][b][iii]. It requires estimation of disputed and contingent claims and of chapter 7 administrative expenses.[7] *Id.* And it requires application of the chapter 7 distribution scheme, taking into account such matters as subordinations (11 U.S.C. § 510) and recoveries from general partners (11 U.S.C. § 723) that would be applied in a chapter 7 liquidation. *M. Long Arabians*, 103 B.R. at 216–17. One such matter, as this court now holds, is mandatory disallowance of claims. *See* 7 COLLIER ¶ 1129.03[7][c].

Liquidation value and expenses of administration are less speculative in this instance than in most because the estate has been reduced to $715,000 in notes and cash: two secured notes have a present value of $275,-000;[8] $440,000 is on deposit in the registry of the court. After deducting remaining expenses of administration of $40,000,[9] about

---

6. Since § 1129(a)(7) applies only to impaired classes, it can be bypassed entirely by leaving the pertinent class unimpaired.

7. It must be emphasized that the estimation of the disputed claim is only for the carefully circumscribed, limited purpose of hypothetically liquidating the debtor under chapter 7. If, for example, the "best interests" test were to be satisfied, the court would be exceedingly reluctant to apply a casually-estimated amount in a "cram down" analysis under § 1129(b), particularly in a liquidating plan that is being attacked as unfairly shifting risk to insider creditors without a persuasive reorganization justification. *Cf. In re Dollar Assocs.*, 172 B.R. 945, 949–53 (Bankr.N.D.Cal.1994).

8. The face amount of the notes totals $325,000. The court has applied a conservative discount rate of 12 percent in calculating the present value.

9. Although the maximum trustee fee on $675,000 is $37,000, the liquidation would be sufficiently straightforward that it is unlikely that trustee fees and expenses in excess of $10,000 could be justified. The debtor's monthly operating reports establish that expenses of chapter 11 administration are essentially current, with the exception of about $14,000 owed to a utility. Perhaps $15,-000 in additional chapter 11 expenses of administration could be expected.

$675,000 would be available to be distributed to creditors and interest holders.

The total nominal claims are about $768,000,[10] of which the unsecured claims are $182,500, including the $175,000 disputed claim of the objecting creditor that, the court estimates, has a value of $87,500.[11] Thus, for purposes of the hypothetical liquidation, unsecured claims are $95,000 and total nominal secured claims are about $675,000.

The question becomes the order in which claims would be paid in a hypothetical chapter 7 liquidation.

### B

Mandatory claim disallowance under § 502(d) is one Bankruptcy Code provision that applies in chapter 7 liquidations. It requires that the court disallow "any claim" of any entity from which property is recoverable by a trustee, or that is the transferee of an avoidable transfer, unless and until the property is turned over and the transfer is paid.[12]

■ The § 502(d) disallowance is in the nature of an affirmative defense to a proof of claim and does not provide independent authority for affirmative relief against the creditor. *Parker N. Am. Corp. v. Resolution Trust Corp. (In re Parker N. Am. Corp.)*, 24 F.3d 1145, 1155 (9th Cir.1994). As an affirmative defense, § 502(d) can even be asserted when an affirmative recovery from the creditor under the pertinent avoiding statute would be time-barred.

■ Formally, § 502(d) operates as a temporary disability. It is temporary in the sense that the disallowance ceases when the creditor disgorges the property in question. Nevertheless, it can be crippling in at least three respects.

■ First, the disability is mandatory. The statutory language "the court shall disallow" leaves no latitude for the court once the predicate rights are determined.

■ Second, while actual adjudication of the avoidance status of the creditor ultimately is necessary, the mere assertion of a prima facie § 502(d) defense is sufficient to place the claim in a status in which it is neither allowed nor disallowed. *See Katchen v. Landy*, 382 U.S. 323, 330, 86 S.Ct. 467, 473, 15 L.Ed.2d 391 (1966) (Bankruptcy Act § 59g).

■ Third, because the focus is on the creditor and not on the specific claim, a small avoidable transfer may require disallowance of all the creditor's claims, even a large secured claim, until the avoidable transfer is disgorged. *See id.* at 330 n. 5, 86 S.Ct. at 473 n. 5. Thus, in this instance, the two avoidance issues involving the $66,000 personal property interest (defeat of secured status under "strongarm" power and unauthorized postpetition transfers) would also prevent payment on the $323,000 deed of trust.

### 1

No reported decision appears to focus upon the question whether § 502(d) must be

---

**10.** This assumes that the net personal property claim of SCF is $66,000.

**11.** Estimating the disputed claim for the limited purpose of the "best interests" test's hypothetical liquidation calls for application of straightforward expected value analysis, based on the court's analysis of the record of the case, reflecting a "50–50" likelihood of success on the merits. Specifically, the probability of success is .5. Accordingly, the expected value (Expected Value = Probability × Claim) is .5 × $175,000 = $87,500. Regarding the narrowly circumscribed purpose of this estimate, see supra note 6.

**12.** Its full text is:
   (d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or

553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, or 553 of this title.
   11 U.S.C. § 502(d).
   It is derived from Bankruptcy Act 57g, which provided:
      (g) The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances, void or voidable under this title, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances.
   11 U.S.C. § 93(g) (repealed 1979).

applied when calculating the hypothetical liquidation under the "best interests" test for chapter 11 plan confirmation.[13] Nevertheless, the straightforward language of the Bankruptcy Code makes § 502(d) a provision that affects the distribution scheme in a chapter 7 liquidation.

The description of the hypothetical liquidation in legislative history of § 1129(a)(7)(A)(ii) does not directly mention § 502(d). The legislative history does, however, cite subordinations under § 510 as an example of how the hypothetical liquidation sweeps in the complexities of the chapter 7 liquidation scheme, including the specialized rules regarding partnership and community property distributions.[14] The leading treatises and commentators similarly omit mention of § 502(d). 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7][C]; 4 NORTON BANKRUPTCY LAW & PRACTICE 2D § 92.14 (William L. Norton, Jr. et al. eds.1996); Richard M. Cieri et al., *"The Long and Winding Road": The Standards to Confirm a Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Part I)*, 3 J. BANKR. L. & PRAC. 3, 54 (1993).

But it is generally agreed that all provisions applicable in a chapter 7 liquidation are to be taken into account when the court determines what sums would be paid to whom in a hypothetical liquidation.

If an actual chapter 7 liquidation were to occur on the date of the hypothetical liquidation, it is beyond cavil that a creditor who is under a § 502(d) disability would receive nothing.

Since the central focus of the "best interests" test for plan confirmation is on what would occur in an actual chapter 7 liquidation, this court holds that any applicable § 502(d) disability must be taken into account in the test's hypothetical liquidation.

2

■■■ The "best interests" analysis in plan confirmation being hypothetical, it is not necessary (as would be required in an actual liquidation) to adjudicate the creditor's § 502(d) status before imposing the § 502(d) disability.[15]

■■■ In computing the hypothetical chapter 7 liquidation, the court is entitled to view the entire record of the case and to engage in rational speculation about what would occur in a chapter 7 liquidation. Among other things, the court can hypothesize that certain claims would evoke the objection of a chapter 7 trustee and can speculate about the likely fate of such objections, bearing in mind the protective purpose of the "best interests" test.[16]

3

■■■ The § 502(d) disability applies to SCF on two counts, based upon this court's assessment of the record, for purposes of a hypothetical liquidation.

The testimony of the debtor's principal at the confirmation hearing established that at least $10,000 of estate funds had been used postpetition without authority in partial payment of SCF's $66,000 prepetition claim, which warrants an inference of transfers avoidable under § 549.[17] And the testimony

---

13. Courts have held that the § 502(d) disability can be enforced to preclude a creditor from accepting or rejecting a plan pursuant to 11 U.S.C. § 1126. *In re American Solar King Corp.*, 90 B.R. 808, 828 (Bankr.W.D.Tex.1988); *In re Coral Petroleum, Inc.*, 60 B.R. 377, 382 (Bankr. S.D.Tex.1986).

14. The pertinent statement from the legislative history is:

In order to determine the hypothetical distribution in a liquidation, the court will have to consider the various subordination provisions of proposed 11 U.S.C. 510, 726(a)(3), 726(a)(4), and the postponement provisions of proposed 11 U.S.C. 724. Also applicable in appropriate cases will be the rules governing

partnership distributions under proposed 11 U.S.C. 723, and distributions of community property under proposed 11 U.S.C. 726(c). H.Rep.No. 95–598, at 412 (1977), reprinted in 1978 U.S.C.C.A.N. 6368.

15. Being strictly accurate, the claim is neither allowed nor disallowed until the predicate facts are adjudicated. *See Katchen v. Landy*, 382 U.S. at 330, 86 S.Ct. at 473 (Bankruptcy Act § 57g).

16. The court also has discretion to adjudicate the § 502(d) issue before ruling on plan confirmation.

17. Corzan's testimony that the balance of the $28,500 came from "other sources" was too ambiguous, in the context of the incestuous relation-

established that SCF's personal property security interest securing the $66,000 claim is unrecorded, which warrants an inference of avoidability pursuant to the trustee's § 544 "strongarm" power.

In a hypothetical liquidation, a competent chapter 7 trustee would be able to recover against SCF under § 544 and § 549. Hence, SCF is subject to the § 502(d) disability for two, independent reasons.

If SCF were not subject to the § 502(d) disability, the unsecured claims would be paid about 56 percent of their total in a chapter 7 liquidation.[18] Since the present value of the payments promised to unsecured creditors would provide payment of between 90 and 100 percent of the unsecured claims, the "best interests" test would have been satisfied in the hypothetical scenario.

SCF, however, is under a § 502(d) disability, which requires that all of its claims be disallowed in the hypothetical chapter 7 liquidation. In consequence, the unsecured claims would be paid in full and would, pursuant to § 726(a)(5), receive interest at the legal rate from the date of the filing of the petition, after which funds would be returned to owners pursuant to § 726(a)(6).[19]

Since the plan does not propose to pay sums that have a present value that reflects interest at the legal rate from the date of the filing of the petition, the "best interests" test is not satisfied when the § 502(d) disability is imposed.

### 4

The debtor orally modified the plan at the close of the confirmation hearing in an attempt to cure the defect by providing that SCF[20] would be paid the balance on its personal property security interest as an unsecured claim. This modification does not, however, surmount the hurdle.

#### a

Merely treating the unpaid balance of the personal property security interest as an unsecured claim does not cure the § 502(d) disability for two reasons. First, the avoidable underlying security agreement must have been actually revoked in order to comply with § 502(d). Second, the modification does not reverse the unauthorized postpetition transfers that are avoidable under § 549 and that form an independent basis for the § 502(d) disability.

#### b

Nor does the oral modification enable the plan to pass the "best interests" test under § 1129(a)(7)(A)(ii).

Treating the $66,000 personal property claim as an unsecured claim would mean that $119,000 would be available to pay unsecured claims of $161,000.[21] A dividend of 74 percent is less than the full payment plus interest that unsecured creditors would otherwise receive in the hypothetical liquidation.

The same result would apply if the plan were further modified to treat SCF's real property claim as unsecured. In that event $342,000 would be available to pay claims of $384,000. An 89 percent dividend is still less than full payment plus interest.

Hence, the modification that occurred orally on the record at the confirmation hearing is inadequate.

### C

In view of the failure to satisfy the "best interests" test with respect to unsecured

---

ships in this case, to warrant an inference that it is not also vulnerable to recovery by a trustee.

18. Present value of funds available on liquidation $675,000—$40,000 expenses of administration—$293,000 CRC secured claim—$223,000 SCF secured real estate claim—$66,000 SCF secured personal property claim = $53,000 available to pay on unsecured claims of $95,000 (55.8%).

19. Present value of funds available on liquidation = $675,000—$40,000 expenses of administra-

tion—$293,000 CRC secured claim—$95,000 unsecured claims—$9,000 interest on unsecured claims = $238,000 to the debtor.

20. Corzan, changing hats, agreed on behalf of SCF.

21. Present value of funds available on liquidation = $675,000—$40,000 expenses of administration—$293,000 CRC secured claim—$223,000 SCF secured real estate claim = $119,000 to pay unsecured creditors.

creditors, the plan in this case could be confirmed without further modification if, and only if, all affected creditors actually accept the plan under § 1129(a)(7)(A)(i).[22] This is a daunting challenge in all but the simplest of situations because each creditor has "pocket veto" power.

■ Affected creditors include all creditors, even those with contingent, unliquidated, or disputed claims. Section 1129(a)(7) does not refer to "allowed claims" or any other qualifying term. Rather, it uses the defined term "claim" that means a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or to unsecured." 11 U.S.C. § 101(5)(A).

The objecting creditor whose claim is disputed and who is ineligible to vote without first having been temporarily allowed under Federal Rule of Bankruptcy Procedure 3018(a) is nevertheless counted for purposes of actual acceptance under § 1129(a)(7)(A)(i). Hence, whenever the "best interests" test is not satisfied, a dissenting creditor is in a position to prevent confirmation merely by withholding its acceptance—exercising what amounts to a "pocket veto."

## II

The adequacy of disclosure under § 1125 is called into question when, as here, the material facts pertaining to the § 502(d) disability come to light at the confirmation hearing and were omitted from the disclosure statement.

The liquidation analysis in the disclosure statement was plainly incorrect in failing to reveal that an entity being paid under the plan had received transfers that would, as a matter of law, require disallowance of all its claims pending disgorgement. This inaccuracy negatively affected the ability of a hypothetical reasonable investor holding an unsecured claim to make an informed judgment about the plan. *See* 11 U.S.C. § 1125(a).

The adequacy of disclosure is made an essential element for plan confirmation by way of § 1129(a)(2), which requires that the proponent of the plan comply with the applicable provisions of title 11. 11 U.S.C. § 1129(a)(2).

The Bankruptcy Code's legislative history explicitly refers to the disclosure requirement of § 1125 as an example of what § 1129(a)(2) is intended to cover. H.R.Rep. No. 95–595, at 412 (1977) & S.Rep. No. 95–989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 & 6368; *Official Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 718–20 (Bankr.E.D.Cal.1992).

■ In order for the disclosure statement to contain adequate information about the liquidation analysis, the plan proponent would have to identify all potential § 502(d) disabilities known to it.[23] In this case, the debtor would need to point out that there are two theories under which its affiliate SCF received avoidable transfers that could trigger the § 502(d) disability. In other words, the plan proponent must inform against its affiliate.

While plan proponents may be reluctant to disclose potentially avoidable transfers that they prefer not to challenge, every plan proponent who would rely on the "best interests" test must include a liquidation analysis in the disclosure statement. As the § 502(d) question can be central to the hypothetical chapter 7 liquidation, it must be addressed in the disclosure statement as part of the liqui-

---

**22.** The plan could be confirmed if it were modified to make unsecured creditors unimpaired. Lack of impairment in the context of a disputed claim that, if undisputed, would be immediately due, owing, and payable, would require a cash reserve sufficient to pay the maximum possible award.

**23.** The court recognizes that wrestling with disclosure of § 502(d) disabilities is yet another pothole in "the long and winding road" to plan confirmation. *See* Richard M. Cieri, et al., *supra.* Nevertheless, it is difficult to perceive how disclosure can be adequate without either identifying potential § 502(d) disabilities or stating that the plan proponent is unaware of any potential § 502(d) disabilities.

dation analysis, if only to assert that there are no known potential § 502(d) disabilities or that the known § 502(d) disabilities would not affect the liquidation analysis with respect to a particular class.

■ The disclosure statement, viewed in retrospect in connection with plan confirmation, did not disclose information adequate to enable a hypothetical reasonable investor holding an unsecured claim to make an informed judgment about the plan as required by § 1125. Consequently, the plan proponent did not comply with applicable provisions of the Bankruptcy Code. Hence, there has been a failure to satisfy the plan confirmation requirement specified by § 1129(a)(2), which failure independently precludes confirmation.

＊　　＊　　＊　　.＊　　＊　　＊

The plan of reorganization proposed by the debtor will not be confirmed.

This opinion constitutes findings of fact and conclusions of law. An appropriate order will issue in a separate document as required by Federal Rule of Bankruptcy Procedure 9021, incorporating Federal Rule of Civil Procedure 58.